## STATE OF CONNECTICUT *v.* KEVIN STANLEY
## (14238)

PETERS, C. J., CALLAHAN, GLASS, BORDEN and BERDON, Js.

*Argued April 30—decision released August 25, 1992*

*Neal Cone,* assistant public defender, with whom, on the brief, was *G. Douglas Nash,* public defender, for the appellant (defendant).

*Mitchell S. Brody,* assistant state's attorney, with whom, on the brief, were *Michael Dearington,* state's attorney, and *Robert J. O'Brien,* assistant state's attorney, for the appellee (state).

BORDEN, J. The defendant, Kevin Stanley, appeals to this court[1] from the judgment of conviction, after a jury trial, of murder in violation of General Statutes § 53a-54a.[2] The defendant claims that: (1) there was insufficient evidence of an intent to kill in order to convict him of murder; (2) the trial court improperly admitted a statement made by the defendant because the waiver of his *Miranda*[3] rights was not made knowingly, intelligently and voluntarily; (3) the trial court improperly admitted a statement made by the defendant because his right to terminate police interrogation after he had invoked his right to remain silent was not scrupulously honored; and (4) the trial court's instructions to the jury undermined the defendant's presumption of innocence and diluted the state's burden of proof. We affirm.

---

[1] The defendant appealed pursuant to General Statutes § 51-199 (b) (3), which provides: "(b) The following matters shall be taken directly to the supreme court . . . (3) an appeal in any criminal action involving a conviction for a capital felony, class A felony, or other felony, including any persistent offender status, for which the maximum sentence which may be imposed exceeds twenty years."

[2] General statutes § 53a-54a provides in pertinent part: "MURDER. (a) A person is guilty of murder when, with intent to cause the death of another person, he causes the death of such person or of a third person or causes a suicide by force, duress or deception . . . ."

[3] *Miranda* v. *Arizona,* 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

The jury reasonably could have found the following facts. On November 7, 1989, at approximately 5:50 p.m., Bridget Page left her home on Orchard Street in New Haven and drove to the home of Javin Green, a friend whom she had been dating, in order to celebrate her birthday. Green lived on Dixwell Avenue in New Haven. Along the way, at the corner of Dixwell Avenue and Argyle Street, Page heard a noise that sounded like a "tap"; then her car's rear window began to break up and fall out as she drove along. When Page arrived at Green's home she told him about the broken window and said that she thought some children had thrown rocks at the window. Green and Page decided to return to the intersection in order to determine who was responsible for the broken window.

They drove back to the intersection of Dixwell Avenue and Argyle Street, parked the car on Argyle Street near the corner and walked over to five individuals who had congregated at the corner. The group consisted of three children, each approximately eight years old, and two young men, each approximately eighteen years old. Located on the corner of Dixwell Avenue and Argyle Street was a laundromat, an entrance to an apartment building and a beauty salon, all fronting on Dixwell Avenue. A street light and the lights from the laundromat were on. Green first spoke to the children, stating that one of them was responsible for the broken window.

At this point, Brenda Clark, who resided at 425 Dixwell Avenue in an apartment directly over the laundromat opened the apartment building entrance door. Her attention was drawn to Green and one of the young men, whom she later identified in court as the defendant. Green and the defendant were standing close to each other, face to face, in front of the laundromat. Green was facing the street with his back to the laundromat. The defendant was facing Green with his back to the street. Page stood within inches of Green, fac-

ing him, on his left. Green was upset and was thrusting his chest towards the defendant's chest, saying "I want that little dude that, you know, shot the rock." The defendant began walking towards Green's right side in an effort to get behind Green. Green told him to stop and the defendant replied "Oh, yes." The defendant next moved back three or four steps towards the street, reached into his pants, pulled out a revolver and fired three or four shots at Green.

After the shots were fired, Green grabbed his face and stomach, cried out "oh, oh" and left the scene by running around the corner onto Argyle Street. Following the departure of Green and Page, the defendant turned his gun towards a "little boy" who ran into the door where Clark was standing. The defendant looked over at Clark, turned around, walked away and entered a nearby car. Page, who initially had not been aware that Green had been shot, followed him around the corner and saw him enter her car on the passenger side. Green told her that he had been shot and she drove him to the hospital, where he died.

## I

The defendant first claims that there was insufficient evidence to support his murder conviction because the record does not reflect proof beyond a reasonable doubt of an intent to kill Green. We disagree.

"The standard of review of an insufficiency claim is clear. We first review the evidence presented at trial, construing it in the light most favorable to sustaining the facts expressly found by the trial court or impliedly found by the jury. We then decide whether, upon the facts thus established and the inferences reasonably drawn therefrom, the trial court or the jury could reasonably have concluded that the cumulative effect of the evidence established the defendant's guilt beyond a reasonable doubt. *State* v. *Jarrett,* 218 Conn. 766,

770–71, 591 A.2d 1225 (1991); *State* v. *Weinberg,* 215 Conn. 231, 253, 575 A.2d 1003 (1990), cert. denied, 498 U.S. 967, 111 S. Ct. 430, 112 L. Ed. 2d 413 (1990); *State* v. *Rollinson,* 203 Conn. 641, 665–66, 526 A.2d 1283 (1987); *State* v. *Garrison,* 203 Conn. 466, 471, 525 A.2d 498 (1987). *State* v. *Lewis,* 220 Conn. 602, 606, 600 A.2d 1330 (1991). While the jury must find every element proven beyond a reasonable doubt in order to find the defendant guilty of the charged offense, each of the basic and inferred facts underlying those conclusions need not be proved beyond a reasonable doubt. *State* v. *Castonguay,* 218 Conn. 486, 507, 590 A.2d 901 (1991). If it is reasonable and logical for the jury to conclude that a basic fact or an inferred fact is true, the jury is permitted to consider the fact proven and may consider it in combination with other proven facts in determining whether the cumulative effect of all the evidence proves the defendant guilty of all the elements of the crime charged beyond a reasonable doubt. *State* v. *Grant,* 219 Conn. 596, 604–605, 594 A.2d 459 (1991)." (Internal quotation marks omitted.) *State* v. *Pinnock,* 220 Conn. 765, 770–71, 601 A.2d 521 (1992).

The defendant was charged with murder in violation of General Statutes § 53a-54a. "In order to be convicted under our murder statute, the defendant must possess the specific intent to cause the death of the victim. General Statutes § 53a-54a. To act intentionally, the defendant must have had the conscious objective to cause the death of the victim. General Statutes § 53a-3 (11) . . . . *State* v. *Carpenter,* 214 Conn. 77, 82, 570 A.2d 203 (1990). Ordinarily, intent can only be proved by circumstantial evidence; it may be and usually is inferred from the defendant's conduct. Id. Intent to cause death may be inferred from the type of weapon used, the manner in which it was used, the type of wound inflicted and the events leading to and immediately following the death. . . . Id., 82–83, quot-

ing *State* v. *Patterson,* 213 Conn. 708, 721, 570 A.2d 174 (1990). Furthermore, it is a permissible, albeit not a necessary or mandatory, inference that a defendant intended the natural consequences of his voluntary conduct. *State* v. *Amarillo,* 198 Conn. 285, 300–304, 503 A.2d 146 (1986)." (Internal quotation marks omitted.) *State* v. *Montanez,* 219 Conn. 16, 20, 592 A.2d 149 (1991).

On the basis of the evidence and the inferences reasonably drawn therefrom, the jury reasonably could have concluded beyond a reasonable doubt that the defendant intended to kill Green. Clark testified that the defendant and Green had been involved in an argument in front of the laundromat before the shooting. She testified that Green had been thrusting his chest into the defendant's chest demanding the name of the child who had broken Page's car window. The jury was given copies of a statement made by the defendant to a New Haven police officer, approximately one month after the shooting had occurred, in which the defendant stated that Green had accused the defendant's younger brother, who was at the scene of the shooting, of breaking Page's window. In that statement, the defendant also stated that Green had threatened to harm the defendant's younger brother and that the defendant had replied that Green "wasn't [going to] . . . do [anything] to [his brother]." From this evidence, the jury reasonably could have inferred that the defendant had a motive for shooting Green, namely, to prevent Green from harming his younger brother or discovering who had broken the window. See *State* v. *Moye,* 177 Conn. 487, 514–15, 418 A.2d 870, vacated, 444 U.S. 893, 100 S. Ct. 199, 62 L. Ed. 2d 129, on appeal after remand, 179 Conn. 761, 409 A.2d 149 (1979) (evidence of motive probative of intent to kill).

Moreover, Clark and Page, who witnessed the shooting, testified that while the defendant and Green had

been standing face to face, the defendant had taken three or four steps back toward the street, away from Green, had pulled out a gun and had fired three or four shots. Clark further testified that Green had grabbed his face and stomach, cried out and left the scene.

Two bullets entered Green. One bullet entered the chest cavity on Green's right side and traveled upward before lodging in the left side of Green's neck. The other bullet entered the perforation in the right side of Green's chest, penetrated the diaphragm and abdominal cavity, and traveled downward before lodging in the left side of Green's lower abdomen.

We have stated that "[o]ne who uses a deadly weapon upon a vital part of another will be deemed to have intended the probable result of that act, and from such a circumstance a proper inference may be drawn in some cases that there was an intent to kill." (Internal quotation marks omitted.) *State* v. *Holley,* 174 Conn. 22, 26, 381 A.2d 539 (1977). From this evidence, therefore, of the defendant's motive, "the type of weapon used, the manner in which it was used, the type of wound inflicted and the events leading to and immediately following the death"; (internal quotation marks omitted) *State* v. *Patterson,* supra, 721; the jury reasonably could have concluded that the state proved beyond a reasonable doubt that the defendant intended to kill Green.

The defendant contends, however, that the state's evidence did not preclude every reasonable hypothesis consistent with innocence because the evidence allowed the conclusion that the defendant had aimed the gun at the ground and, therefore, allowed the conclusion that the defendant had no intent to kill Green. He argues that because (1) Page testified that she thought the defendant had been shooting at the ground, (2) the bullet tracks traveled in opposite directions, and

(3) both bullets recovered from Green's body were damaged, the evidence "does not preclude the reasonable possibility that Green was hit by wildly fired bullets, rather than deliberately aimed ones, and even bullets ricocheting from the sidewalk and/or curb, as evidenced by the otherwise unexplained heavy damage to the bullets and the two opposite bullet tracks in the body." The defendant's claim, at bottom, is that the jurors reasonably could have inferred that the defendant aimed the gun at the ground and, if they had drawn this inference, the state would not have proven beyond a reasonable doubt that the defendant intended to kill Green. We are unpersuaded.

"The rule is that the jury's function is to draw whatever inferences from the evidence or facts established by the evidence it deems to be reasonable and logical. *State* v. *Tatem,* 194 Conn. 594, 598, 483 A.2d 1087 (1984); *State* v. *Foord,* [142 Conn. 285, 294, 113 A.2d 591 (1955)]. *State* v. *Dumlao,* 3 Conn. App. 607, 616–17, 491 A.2d 404 (1985)." (Internal quotation marks omitted.) *State* v. *Grant,* supra, 604. "[I]n viewing evidence which could yield contrary inferences, the jury is not barred from drawing those inferences consistent with guilt and is not required to draw only those inferences consistent with innocence." (Internal quotation marks omitted.) Id. "That the jury might have drawn other possible inferences from these facts is not sufficient to undermine its verdict, since proof of guilt must be established beyond a reasonable doubt, not beyond a possible doubt." (Internal quotation marks omitted.) Id.

Whether the gun was aimed at Green or pointed at the ground was an evidentiary fact that was for the jury to determine. While Page testified that she "thought" the defendant "was shooting at the ground," the jury was not required to credit that testimony. Instead the jury was entitled to credit Clark's testimony indicating that the defendant had fired the gun directly

at Green.[4] This testimony, when coupled with the fact that Green and the defendant were engaged in an argument immediately preceding the shooting and the fact that the defendant had a motive to kill Green, allowed the jury reasonably to infer that the defendant had aimed the gun at Green. Furthermore, regarding the direction of the bullets, the medical examiner testified that the bullets might have traveled in opposite directions due to "the person who held the gun chang[ing] the position of the gun, or the victim who receives the injuries chang[ing] his position." The jury reasonably could have inferred that after the defendant fired the first shot at Green, either the defendant changed the position of the gun or Green changed his body position, thus explaining the different directions traveled by the bullets.[5] Finally, regarding the damage to the bullets, although the firearms examiner testified that the bullets from Green's body had "heavy damage to them," this testimony did not preclude the inference that the bullets directly entered Green's body. Indeed the defendant never argued at trial that the damage to the bullets precluded such an inference.

---

[4] Clark testified as follows:

"Q. How did this argument end, Ms. Clark?

"A. When [the defendant] took a few steps back, *he shot [Green]*.

"Q. And whom do you mean by [the defendant]?

"A. *The person that I saw shoot Mr. Green.* . . . [H]e just went down in his pants and pulled out a gun. I did not know he had a gun. I thought he was going—he went down in his pants like this. *And he just shot him.*" (Emphasis added.)

[5] While the jury might reasonably have inferred that the opposite directions traveled by the bullets and the damage to the bullets were caused by the bullets ricocheting off of the ground, "[w]ith respect to individual pieces of evidence, when the evidence is subject to two possible interpretations, the jury is not required to accept the interpretation consistent with innocence, but is allowed to choose the interpretation that it finds reasonable and logical. *State* v. *Grant,* 219 Conn. 596, 604, 594 A.2d 459 (1991)." *State* v. *Pinnock,* 220 Conn. 765, 787 n.7, 601 A.2d 521 (1992).

## II

The defendant next claims that the trial court improperly admitted into evidence a statement made by him to a New Haven police officer because: (1) the waiver of his *Miranda* rights was not knowing, intelligent and voluntary; and (2) under our state constitution the state must prove beyond a reasonable doubt that the defendant's waiver of his *Miranda* rights was made knowingly, intelligently and voluntarily. We disagree.

### A

The following facts are relevant to this claim. On December 3, 1989, the defendant was arrested for a shooting unrelated to this case. He was taken to the New Haven police department at approximately 3 a.m. At that time, the defendant was also a suspect in the Green murder. At police headquarters, Detective Joseph Pettola gave the defendant a *Miranda* rights waiver form, which was read to him, and advised him of his *Miranda* rights. The defendant indicated that he understood his rights. He was able to read and write English and did not appear to be under the influence of drugs or alcohol. The defendant refused to sign the waiver form. When Pettola asked the defendant whether he wanted to discuss the other shooting, the defendant said that he had had a gun, that he had fired it in the air and that he did not want to talk further about the incident. When asked about the shooting in this case, the defendant refused to speak about the incident, at which point the police questioning, which had lasted approximately five minutes, was terminated. The defendant never requested an attorney. Pettola then escorted the defendant to a detention area.

At 8 a.m., Detective Gilbert Burton arrived at the New Haven police department and picked up the defendant at a lineup. Before picking up the defend-

ant, Burton had asked another police officer to ask the defendant if he was willing to talk with him, and the defendant had indicated that he was willing to do so. Burton then took the defendant to an interview room, where he informed the defendant that he was going to question him about the Green murder. Burton then read a *Miranda* rights waiver form to the defendant.[6] The defendant read the form, initialed each line identifying a protected right and signed the bottom of the form, at which point a taped interview ensued. During the interview, Burton periodically turned off the tape recorder "to explain questions or to make [the defendant] more aware of what was going on" or to "think of a question to ask."

The interview began at 8:45 a.m. and ended at 9:25 a.m. The tape recording lasted for approximately fifteen minutes. After the interview was completed, the tape was transcribed, the defendant read and initialed each page of the transcription, and he signed the last page. The statement, a copy of which was entered into evidence as a full exhibit, contained several incriminating statements. Although the defendant denied shooting Green, he admitted that he had been at the scene of the shooting and that Green had been threatening his younger brother.

After a hearing on the defendant's motion to suppress the statement, the trial court noted that "[t]he question before the court . . . is that with the earlier refusal to waive any of his rights under *Miranda* can the police re-commence or resume interrogation of a

---

[6] The waiver form contained the *Miranda* warnings, a list of each warning preceded by a space for the suspect's initials and a paragraph stating: "I am willing to answer questions and make this statement knowing that I have and fully understand these rights. I do not want a lawyer at this time. I do make the following statements without fear, threats or promises of favor, knowing that this statement can be used *for or against me* in a court of law." (Emphasis added.)

defendant when on a subsequent occasion the accused indicates a desire to waive his rights." The trial court concluded, relying on *Michigan* v. *Mosley,* 423 U.S. 96, 96 S. Ct. 321, 46 L. Ed. 2d 313 (1975), that the police could reinterrogate a defendant who had waived his right to remain silent if the defendant waived those rights at the subsequent interrogation. The court further stated that Connecticut case law permits reinterrogation of an accused after an initial election to remain silent when, as in this case, the two interviews are separate, when the first interrogation ceased immediately upon the defendant's invocation of his right to remain silent, when new *Miranda* warnings are given before reinterrogation, and when no attorney was requested.

Having concluded that the police may reinterrogate a defendant who had previously invoked his right to remain silent, the court next considered the issue of whether the defendant's waiver of his *Miranda* rights to Burton was knowing, intelligent and voluntary. The court noted that "[w]e do know that the *Miranda* rights can be waived by a defendant and the burden is upon the state to prove by a preponderance of the evidence that the defendant knowingly, voluntarily and intelligently waived his rights to remain silent." The court then concluded that "from a review of the transcript, it does not appear that there was any weakness of will or mind either by a lengthy period of confinement or deprivation or the influence of any outside or extraneous forces." The court stated that the defendant's answers to Burton's questions were "responsive and they were complete. They were not monosyllabic, but they were in some cases extended answers. And [the defendant] himself . . . indicated that he was more than willing to [talk] since he was not involved." The court further stated that the defendant's prior criminal record "would seem to demonstrate that he . . .

probably had received his *Miranda* rights on prior occasions . . . [and that the defendant had] a tenth grade education . . . . And so English is not a problem."

B

The defendant first claims that the waiver of his *Miranda* rights was not knowing, intelligent and voluntary. "To be valid, a waiver must be voluntary, knowing and intelligent. *Miranda* v. *Arizona,* 384 U.S. 436, 475, 478, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966); *State* v. *Gonzalez,* 206 Conn. 213, 217, 537 A.2d 460 (1988); *State* v. *Boscarino,* 204 Conn. 714, 743, 529 A.2d 1260 (1987). The state has the burden of proving by a preponderance of the evidence that the defendant voluntarily, knowingly and intelligently waived his *Miranda* rights. *State* v. *Hernandez,* 204 Conn. 377, 395, 528 A.2d 794 (1987); *State* v. *Chung,* 202 Conn. 39, 48, 519 A.2d 1175 (1987); *State* v. *Smith,* 200 Conn. 465, 481, 512 A.2d 189 (1986). Whether a purported waiver satisfies those requirements is a question of fact that depends on the circumstances of the particular case. *North Carolina* v. *Butler,* 441 U.S. 369, 374–75, 99 S. Ct. 1755, 60 L. Ed. 2d 286 (1979); *Johnson* v. *Zerbst,* 304 U.S. 458, 464, 58 S. Ct. 1019, 82 L. Ed. 2d 1461 (1938); *State* v. *Boscarino,* supra; *State* v. *Chung,* supra." *State* v. *Northrop,* 213 Conn. 405, 417, 568 A.2d 439 (1990). "Although the issue is therefore ultimately factual, our usual deference to fact-finding by the trial court is qualified, on questions of this nature, by the necessity for a scrupulous examination of the record to ascertain whether such a factual finding is supported by substantial evidence." *State* v. *Harris,* 188 Conn. 574, 580, 452 A.2d 634 (1982), cert. denied, 460 U.S. 1089, 103 S. Ct. 1785, 76 L. Ed. 2d 354 (1983).

"After a careful review of the record, we conclude that the state has met its burden of proof. The defendant was read his *Miranda* rights, read those rights him-

self, initialed each of them, told the detective that he understood those rights, signed the waiver form, had no difficulty reading, was articulate, and was not under the influence of alcohol or drugs." *State* v. *Clark,* 24 Conn. App. 115, 121, 585 A.2d 1266, cert. denied, 218 Conn. 903, 588 A.2d 1078 (1991). Furthermore " '[a] defendant's express written and oral waiver is "strong proof" that the waiver is valid. *North Carolina* v. *Butler,* [supra, 373]; *State* v. *Derrico,* [181 Conn. 151, 164, 434 A.2d 356, cert. denied, 449 U.S. 1064, 101 S. Ct. 789, 66 L. Ed. 2d 607 (1980)].' *State* v. *Chung,* supra, 50–51." *State* v. *Northrop,* supra, 418–19. Moreover, the record indicates that the defendant was aware of his *Miranda* rights due to prior arrests and convictions. See *State* v. *Usry,* 205 Conn. 298, 533 A.2d 212 (1987) (defendant's experience with the police and familiarity with the warnings a factor in determining the defendant's capacity to understand the *Miranda* warnings). We conclude, therefore, that "there was substantial evidence from which the trial court could have found that the defendant was capable of and did in fact voluntarily, knowingly and intelligently waive his *Miranda* rights. That finding will be reversed only if the trial court was clearly erroneous. *United States* v. *Alderdyce,* 787 F.2d 1365, 1368 (9th Cir. 1986). It was not." *State* v. *Northrop,* supra, 419.[7]

---

[7] The defendant asserts a number of reasons why his waiver was not knowing, intelligent and voluntary, none of which has been adequately briefed to merit extensive consideration.

The defendant first takes issue with the phrase "this statement can be used *for* or against me in a court of law" in the waiver form. (Emphasis added.) See footnote 6, supra. He asserts that the use of the word "for" in the waiver form acted as a subtle inducement for the defendant to speak. We first note that pursuant to *Miranda* v. *Arizona,* 384 U.S. 436, 469, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966), a person about to be interrogated must be told that "anything said can and will be used against the individual in court." Thus, the use of the word "for" in the waiver form inappropriately broadens the proper *Miranda* warning. Absent a showing, however, that the defendant was misled by this semantical error in the waiver form into saying something he would otherwise not have said, we

C

The defendant next claims that under our state constitution the state must prove beyond a reasonable doubt, rather than by a preponderance of the evidence, that the defendant's waiver of his *Miranda* rights was made knowingly, intelligently and voluntarily.[8] Since the defendant did not preserve this claim at the trial court, he can only prevail if his claim meets the conditions set out in *State* v. *Golding,* 213 Conn. 233, 567 A.2d 823 (1989).

"In order to prevail on appeal on a constitutional claim, that has not been adequately preserved at trial, the defendant must meet all of the following conditions:

cannot conclude that this language vitiated the defendant's waiver. Moreover, two other places on the waiver form referred only to the negative consequences of giving a statement. See, e.g., *Commonwealth* v. *Camm,* 443 Pa. 253, 261, 277 A.2d 325 (1971), cert. denied, 405 U.S. 1046, 92 S. Ct. 1320, 31 L. Ed. 2d 589 (1972).

Similarly, the defendant's claim that Burton's act of turning off the tape recorder during the interview undercut the validity of the defendant's waiver also must fail, absent any specific showing that the unrecorded periods were marked by police overreaching. See *State* v. *Derrico,* 181 Conn. 151, 164, 434 A.2d 356, cert. denied, 449 U.S. 1064, 101 S. Ct. 789, 66 L. Ed. 2d 607 (1980).

The defendant next contends that Burton's testimony, at the suppression hearing, that it was possible that Burton had mentioned to the defendant that the best thing for him to do was to give a statement to Burton so the defendant's mother and younger brother would not get involved in the case, resulted in a coerced waiver of his *Miranda* rights. This claim founders on Burton's subsequent testimony, where he stated that he "did not promise [the defendant] . . . that his mother and brother might not have been involved if he were to go ahead and give . . . a statement."

Finally, the defendant contends, in three sentences, that because he was "sleepy and tired" his waiver was not knowing, intelligent and voluntary. This claim, however, is belied by the trial court's finding that the defendant's answers were responsive and complete and that the defendant had not exhibited any weakness of will or mind.

[8] Under the federal constitution, the state must prove by a preponderance of the evidence that a defendant's waiver of his *Miranda* rights was made knowingly, intelligently and voluntarily. See *Colorado* v. *Connelly,* 479 U.S. 157, 107 S. Ct. 515, 93 L. Ed. 2d 473 (1986).

(1) the record is adequate to review the alleged claim of error; (2) the claim is of constitutional magnitude alleging the violation of a fundamental right; (3) the alleged constitutional violation clearly exists and clearly deprived the defendant of a fair trial; and (4) if subject to harmless error analysis, the state has failed to demonstrate harmlessness of the alleged constitutional violation beyond a reasonable doubt." (Internal quotation marks omitted.) *State* v. *Pinnock,* 220 Conn. 765, 778, 601 A.2d 521 (1992); see *State* v. *Golding,* supra, 239–40. "We have also held that we remain free to dispose of the claim by focusing on whichever condition is most relevant in the particular circumstances. . . . *State* v. *Pinnock,* supra; *State* v. *Watlington,* 216 Conn. 188, 192, 579 A.2d 490 (1990); *State* v. *Golding,* supra, 240." (Internal quotation marks omitted.) *State* v. *Nelson,* 221 Conn. 635, 639, 605 A.2d 1381 (1992).

We conclude that in the present case there does not exist an adequate record upon which to review this claim. First, the defendant never requested the trial court to determine whether the state had proven beyond a reasonable doubt that the defendant knowingly, intelligently and voluntarily waived his *Miranda* rights. We do not know, therefore, whether the trial court would have found that the state had sustained that higher burden of proof. As we stated earlier, "[w]hether a purported waiver [was knowing, intelligent and voluntary] . . . is a question of fact that depends on the circumstances of the particular case." *State* v. *Northrop,* supra, 417. Since such a determination is a question of fact, even if we were to agree with the defendant, we would have to remand the case to the trial court for that factual determination, rather than to grant the defendant a new trial. Since, under the test in *Golding,* we must determine whether the defendant can *prevail* on his claim, a remand to the

trial court would be inappropriate. The first prong of *Golding* was designed to avoid remands for the purpose of supplementing the record.

Moreover, since we do not know whether the trial court would have found that the state had sustained the reasonable doubt burden of proof, we do not know whether the outcome of this case would have been different if that burden of proof were applicable. Thus, deciding this issue on this record would be contrary to our usual and prudent practice of only deciding a constitutional claim when it is necessary to the determination of the case. See *State* v. *Kimbro,* 197 Conn. 219, 240, 496 A.2d 498 (1985) (*Shea, J.,* dissenting), overruled on other grounds, *State* v. *Barton,* 219 Conn. 529, 594 A.2d 917 (1991); see also *State* v. *Zach,* 198 Conn. 168, 502 A.2d 896 (1985) (court should not anticipate question of constitutional law in advance of necessity of deciding it). We recognize that this conclusion in effect eliminates the possibility of a *Golding* analysis for this type of claim, since under our analysis the defendant would ordinarily be required to preserve this claim at trial. That result does not change the facts that we do not have an adequate record on which to review such a claim, and that to undertake such a review would be to reach out to decide a serious constitutional claim where to do so might be unnecessary.[9]

---

[9] The dissent states that if "the defendant had raised this claim in the trial court and the court had rejected it and applied the preponderance [of the evidence] standard . . . we would clearly be bound to review the claim on appeal, and the record would be adequate to do so." The dissent argues that since we are "presented with exactly the same record for review," the only difference being that the defendant did not preserve the claim at trial, we should "review" this claim under *Golding.* The dissent assumes, however, that had the defendant preserved this claim at trial, the record on appeal in that case would have been the same record as the one in the present case. That assumption is incorrect.

Had the defendant preserved this claim at trial by raising the issue, even if the trial court had rejected the claim that the state must meet the higher burden of proof and only applied the preponderance of the evidence stan-

## III

The defendant next claims that, even if we conclude that the defendant's waiver of his *Miranda* rights was knowing, intelligent and voluntary, the statement should not have been admitted pursuant to *Michigan v. Mosley*, 423 U.S. 96, 96 S. Ct. 321, 46 L. Ed. 2d 313 (1975), because the defendant's right to terminate police interrogation after he had invoked his right to remain silent was not scrupulously honored.[10] We disagree.

In *Michigan v. Mosley*, supra, 97, the defendant was arrested for robbery. After effecting the arrest, a police officer advised the defendant of his *Miranda* rights and had him read and sign the constitutional rights notification certificate. Id. When the officer began to interrogate him about the robbery, the defendant refused to talk and the officer then ceased the interrogation. Id. The questioning lasted approximately twenty min-

dard, we would be required to determine whether the defendant should prevail on this claim only if the record indicated that imposition of the higher standard of proof would have made a difference in the case. In such a situation, in order to present us with a record in which the higher standard of proof would have made a difference in the case, the defendant would have been required to file a motion for articulation requesting the trial court to determine whether the state had met the higher burden of proof. Upon the granting of such a motion, if the trial court had determined that the state's proof met the lower but not the higher standard of proof, we would then have an adequate record upon which to determine such a claim.

[10] The defendant also claims that we should follow a different analysis under our state constitution when a defendant invokes his right to remain silent, namely, that reinterrogation can only take place if the defendant reinitiates conversation. Cf. *Edwards v. Arizona*, 451 U.S. 477, 101 S. Ct. 1880, 68 L. Ed. 2d 378, reh. denied, 452 U.S. 973, 101 S. Ct. 3128, 69 L. Ed. 2d 984 (1981) (if defendant has invoked right to counsel, rather than right to remain silent, police cannot reinterrogate unless defendant initiates conversation). Because the defendant has offered no independent analysis under our state constitution, we do not review this claim. We therefore consider this claim under the federal constitution, pursuant to *Michigan v. Mosley*, 423 U.S. 96, 96 S. Ct. 321, 46 L. Ed. 2d 313 (1975).

utes. At no time during the questioning did the defendant request to speak with a lawyer. Approximately two hours later, another police officer brought the defendant to an interview room in order to interrogate him about a separate incident, a murder. Id., 97–98. That officer advised the defendant of his *Miranda* rights and had him sign the constitutional rights form. Id. During the interrogation, the defendant made a statement implicating himself in the murder. Id., 98. That interrogation lasted approximately fifteen minutes and at no point during its course did the defendant request to speak with a lawyer. Id. The defendant moved to suppress the statement.

The United States Supreme Court held that "the admissibility of statements obtained after the person in custody has decided to remain silent depends under *Miranda* on whether his 'right to cut off questioning' was 'scrupulously honored.' " Id., 104. The court then concluded that the defendant's right to cut off questioning was fully respected because: (1) the first interrogating police officer had immediately ceased his interrogation when the defendant invoked his right to remain silent; (2) the second interrogating police officer had waited a significant period of time, more than two hours, before reinterrogating the defendant; (3) the reinterrogation concerned a crime unrelated to the first interrogation; and (4) before the second interrogation began, the defendant had been advised of his *Miranda* rights and had waived those rights. Id., 104–105.

The only arguable difference between this case and *Mosley* is that in the present case the second interrogating officer, Burton, questioned the defendant about the same crime, the Green murder, about which the first interrogating officer, Pettola, had questioned the defendant. The sole basis of the defendant's argument is that because the subsequent interrogation by the

police concerned the same crime about which the defendant had previously refused to talk, the police, per se, failed scrupulously to honor the defendant's fifth amendment right to remain silent. We disagree.

We do not interpret *Mosley* to stand for the proposition that the police can never reinterrogate a suspect, who has invoked his right to remain silent, regarding the same crime about which he had refused to talk.[11] In *Mosley*, the fact that the second officer's interrogation involved a separate crime from the first interrogation was only one factor that the court considered when concluding that the defendant's right to remain silent had been scrupulously honored. The court also considered the fact that the first interrogating police officer immediately ceased his interrogation when the defendant invoked his right to remain silent, that the second interrogating police officer waited a significant period of time, more than two hours, before reinterrogating the defendant, and that before the second interrogation began the defendant was fully advised of his *Miranda* rights and waived those rights.

Indeed, a broader interpretation of *Mosley* would result in a per se proscription of any further questioning by the police once the defendant invokes his right to remain silent. In essence, the defendant's interpretation of *Mosley* would limit the opportunity of the police to reinterrogate a defendant to those situations

---

[11] Our conclusion is in accord with other jurisdictions. See *Kelly* v. *Lynaugh,* 862 F.2d 1126 (5th Cir. 1988); *United States* v. *Hsu,* 852 F.2d 407 (9th Cir. 1988); *Grooms* v. *Keeney,* 826 F.2d 883 (9th Cir. 1987); *United States* v. *Udey,* 748 F.2d 1231 (8th Cir. 1984); *Jackson* v. *Wyrick,* 730 F.2d 1177 (8th Cir. 1984); *United States* v. *Collins,* 462 F.2d 792 (2d Cir.), cert. denied, 409 U.S. 988, 93 S. Ct. 343, 34 L. Ed. 2d 254 (1972); *Hatley* v. *State,* 289 Ark. 130, 709 S.W.2d 812 (1986); *People* v. *Quezada,* 731 P.2d 730 (Colo. 1987); *People* v. *Foster,* 119 Ill. 2d 69, 518 N.E.2d 82 (1987); but see *Matter of T.T.T.,* 365 A.2d 366 (D.C. 1976); *Commonwealth* v. *Walker,* 470 Pa. 534, 368 A.2d 1284 (1977); see also 1 W. LaFave & J. Israel, Criminal Procedure (1984) § 6.9, p. 537.

where the defendant is under suspicion for more than one crime. This result is contrary to the reasoning in *Mosley*, which refused to "create a per se proscription of indefinite duration upon any further questioning by any police *on any subject,* once the person in custody has indicated a desire to remain silent." (Emphasis added.) Id., 102–103. The court further noted that such a per se prohibition "would transform the *Miranda* safeguards into wholly irrational obstacles to legitimate police investigative activity, and deprive suspects of an opportunity to make informed and intelligent assessments of their interests." Id., 102. Under the defendant's interpretation, only those defendants under suspicion for more than one crime would have the "opportunity to make informed and intelligent assessments of their interests."

The purpose of the "scrupulously honor" test is to avoid situations where the police fail "to honor a decision of a person in custody to cut off questioning, either by refusing to discontinue the interrogation upon request or by persisting in repeated efforts to wear down his resistance and make him change his mind." Id., 105–106. Considering the facts in the present case, we conclude that the police did not persist "in repeated efforts to wear down [the defendant's] resistance and make him change his mind."

In this case, after the defendant was arrested, Pettola fully advised him of his *Miranda* rights. The defendant said he understood them. Pettola interrogated the defendant about an unrelated assault and also about the murder in this case. When the defendant refused to talk about the murder, Pettola immediately ceased the interrogation. This interrogation, during which the defendant did not request a lawyer, lasted only five minutes. Approximately five hours later, longer than the two hour period in *Mosley*, Burton brought the defendant to an interview room to

interrogate him about the murder. He had first asked another police officer to speak to the defendant to determine if the defendant would speak with him, which the defendant agreed to do. Burton read the defendant his *Miranda* rights. The defendant again stated that he understood his rights and initialed each protected right. During the course of the interview the defendant made incriminating statements. That interrogation lasted approximately forty-five minutes and the defendant again did not request a lawyer. Based on the foregoing, we conclude that the defendant's right to remain silent was scrupulously honored.

## IV

The defendant's final claim is that the trial court's jury instructions undermined the defendant's presumption of innocence and diluted the state's burden of proof. We disagree.

The court instructed the jury that "[i]n summary, and to remind you of your obligation, it is the sworn duty of courts and jurors to safeguard the rights of persons charged with crime by respecting the presumption of innocence which the law imputes to every person so charged. *But as I said, the law is made to protect society and innocent persons and not to protect guilty ones.*" (Emphasis added.) The defendant took an exception to this instruction, noting that "our Supreme Court has always okayed the language . . . . That it protects the innocent and not the guilty. Anywhere that appears, I would take an exception hoping that the Supreme Court will some day change its mind." We do not change our mind.

"The record reveals that the trial court's jury instructions concerning the presumption of innocence and reasonable doubt are the same or similar to jury instructions that previously have been approved by this court. See, e.g., *State* v. *Brown,* 199 Conn. 14, 28, 505

A.2d 690 (1986); *State* v. *Leecan,* 198 Conn. 517, 538–39, 504 A.2d 480, cert. denied, 476 U.S. 1184, 106 S. Ct. 2922, 91 L. Ed. 2d 550 (1986); *State* v. *Findlay,* 198 Conn. 328, 345–46, 502 A.2d 921, cert. denied, 476 U.S. 1159, 106 S. Ct. 2279, 90 L. Ed. 2d 721 (1986); *State* v. *Palmer,* 196 Conn. 157, 168–69, 491 A.2d 1075 (1985); *State* v. *Just,* 185 Conn. 339, 353, 441 A.2d 98 (1981). Those instructions, and any deviation from the previously approved language of those instructions did not, when viewed in the context of the entire charge, dilute the defendant's presumption of innocence or lessen the state's burden of proof as claimed by the defendant. It is clear after reading the court's charge in its entirety that the jury was adequately informed that the defendant was presumed innocent until the state proved otherwise and that it was the state's burden to prove him guilty beyond a reasonable doubt. *State* v. *Derrico,* 181 Conn. 151, 170–71, 434 A.2d 356, cert. denied, 449 U.S. 1064, 101 S. Ct. 789, 66 L. Ed. 2d 607 (1980); *State* v. *Guthridge,* 164 Conn. 145, 154, 318 A.2d 87 (1972), cert. denied, 410 U.S. 988, 93 S. Ct. 1519, 36 L. Ed. 2d 186 (1973); *State* v. *Cari,* 163 Conn. 174, 181, 303 A.2d 7 (1972)." *State* v. *Thomas,* 214 Conn. 118, 119–20, 570 A.2d 1123 (1990).

The judgment is affirmed.

In this opinion PETERS, C. J., CALLAHAN and GLASS, Js., concurred.

BERDON, J., dissenting.

I

The majority refuses to review whether under our state constitution the prosecution is required to prove beyond a reasonable doubt that the defendant's confession was voluntary because (1) he did not preserve the claim before the trial court, and (2) there is an insufficient record to review the claim under the *Gold-*

*ing* doctrine.[1] The majority confuses preservation with adequacy of the record. Although I agree that the defendant did not preserve this claim in the trial court, I believe there is an adequate record to review it. Whether voluntariness of the confession must be proved beyond a reasonable doubt is an isolated question of state constitutional law. The fact that the defendant's confession was admitted into evidence against him at trial despite his motion to suppress it as involuntary provides an adequate record for review of this abstract legal issue. If the defendant had raised this claim in the trial court and the court had rejected it and applied the preponderance standard in determining voluntariness, we would clearly be bound to review the claim on appeal, and the record would be adequate to do so. In this case, we are presented with exactly the same record for review of the defendant's claim. The only difference is that the defendant did not preserve the claim, but that is the purpose for having the *Golding* doctrine. Therefore, I consider the record adequate and would review this unpreserved constitutional claim under *Golding*.

A majority of the United States Supreme Court has held that, under the fifth amendment to the federal constitution, the state need prove the voluntariness of a confession by a fair preponderance of the evidence only. *Lego* v. *Twomey,* 404 U.S. 477, 92 S. Ct. 619, 30 L. Ed. 2d 618 (1972). Nevertheless, the majority in *Lego* remarked that "the States are free, pursuant to their own law, to adopt a higher standard. They may indeed differ as to the appropriate resolution of the values they find at stake." Id., 489. Furthermore, "[i]t is well established that federal constitutional and statutory law establishes a minimum national standard for the exercise of individual rights and does not inhibit state governments from affording higher levels of protec-

---

[1] *State* v. *Golding,* 213 Conn. 233, 567 A.2d 823 (1989).

tion for such rights. . . . *Cologne* v. *Westfarms Associates,* 192 Conn. 48, 57, 469 A.2d 1201 (1984). *State* v. *Barton,* 219 Conn. 529, 546, 594 A.2d 917 (1991)." (Internal quotation marks omitted.) *State* v. *Geisler,* 222 Conn. 672, 684, 610 A.2d 1225 (1992).

The right to have the involuntary confession excluded, under the state constitution, is embraced in the following constitutional clause: "No person shall be compelled to give evidence against himself . . . . " Conn. Const., art. I, § 8 (1965). This clause is virtually identical to the one that appeared in our first formal constitution of 1818; Conn. Const., art. I, § 9 (1818); and that of the federal constitution. U.S. Const., amend. V. "What is thereby protected from governmental invasion is, quite simply, 'the right of a person to remain silent unless he chooses to speak in the unfettered exercise of his own will.' *Malloy* v. *Hogan,* [378 U.S. 1, 8, 84 S. Ct. 1489, 12 L. Ed. 2d 653 (1964)]. Hence, a confession is involuntary and inadmissible unless it is 'the product of a rational intellect and a free will.' *Blackburn* v. *Alabama,* 361 U.S. 199, 208 [80 S. Ct. 274, 4 L. Ed. 2d 242] (1960) . . . ." *Lego* v. *Twomey,* supra, 491 (Brennan, J., dissenting).

The value the framers of our state constitution placed on the right to remain silent is evident and important in determining the contours of the state constitutional protection. *State* v. *Geisler,* supra, 685. Zephaniah Swift, a leading jurist at the time of the adoption of our constitution of 1818, wrote in his treatise on the law that "the confession must be perfectly voluntary: for if the *least degree of influence* appear to be exercised over the prisoner's mind, to induce him to disclose his guilt, the whole will be rejected." (Emphasis added.) 2 Z. Swift, A Digest of the Laws of the State of Connecticut (1823) p. 408. Justice Swift also pointed out in his treatise on evidence that voluntary confessions "are deemed to be the most

conclusive evidence . . . ." Z. Swift, A Digest on the Law of Evidence (1810) p. 133. He also noted, however, that "[t]here is, perhaps, no part of evidence in which there is so much misrepresentation and fabrication, as in testifying to the confession of a party." Id., p. 149.

Common law precedent also leads me to the conclusion that our state constitution requires a higher standard of proof of voluntariness of a confession. E. Peters, "Common Law Antecedents of Constitutional Law in Connecticut," 53 Alb. L. Rev. 259, 263 (1989). Blackstone, in formally shaping the contours of our common law, wrote: "[I]ndeed, even in cases of felony at the common law, [confessions] are the weakest and most suspicious of all testimony; ever liable to be obtained by artifice, false hopes, promises of favor, or menaces; seldom remembered accurately, or reported with due precision; and incapable in their nature of being disproved by other negative evidence." 4 W. Blackstone, Commentaries on the Laws of England (1807) p. 357.

My conclusion that voluntariness of an accused's confession must be proven beyond a reasonable doubt is one that has been reached by numerous courts throughout the nation. See, e.g., *People* v. *Dingle,* 174 Cal. App. 3d 21, 219 Cal. Rptr. 707 (1985); *Taylor* v. *State,* 479 N.E.2d 1310 (Ind. 1985); *State* v. *Nuccio,* 454 So. 2d 93 (La. 1984); *State* v. *Collins,* 297 A.2d 620 (Me. 1972); *Commonwealth* v. *Mandile,* 397 Mass. 410, 492 N.E.2d 74 (1986); *Jones* v. *State,* 461 So. 2d 686 (Miss. 1984); *State* v. *Phinney,* 117 N.H. 145, 370 A.2d 1153 (1977); *People* v. *Tucker,* 101 App. Div. 2d 601, 475 N.Y.S.2d 151 (1984); *State* v. *Hintz,* 318 N.W.2d 915 (S.D. 1982).

Justice Brennan, writing for the dissenters in the four to three *Lego* decision, makes a powerful argument for requiring proof beyond a reasonable doubt. "The standard of proof required for a criminal conviction presents

a similar situation, yet we have held that guilt must be established by proof beyond a reasonable doubt. *In re Winship,* 397 U.S. 358, 361–64 [90 S. Ct. 1068, 25 L. Ed. 2d 368] (1970); see id., at 370–372 (Harlan, J., concurring). Permitting proof by a preponderance of the evidence would necessarily result in the conviction of more defendants who are in fact innocent. Conversely, imposing the burden of proof beyond a reasonable doubt means that more defendants who are in fact guilty are found innocent. It seems to me that the same considerations that demand the reasonable-doubt standard when guilt or innocence is at stake also demand that standard when the question is the admissibility of an allegedly involuntary confession.

"We permit proof by a preponderance of the evidence in civil litigation because 'we view it as no more serious in general for there to be an erroneous verdict in the defendant's favor than for there to be an erroneous verdict in the plaintiff's favor.' Id., at 371. (Harlan, J., concurring). We do not take that view in criminal cases. We said in *Winship* that the reasonable-doubt standard 'is a prime instrument for reducing the risk of convictions resting on factual error. The standard provides concrete substance for the presumption of innocence . . . .' Id., at 363. As Mr. Justice Harlan put it in his concurring opinion, the requirement of proof beyond a reasonable doubt is 'bottomed on a fundamental value determination of our society that it is far worse to convict an innocent man than to let a guilty man go free.' Id., at 372.

"If we permit the prosecution to prove by a preponderance of the evidence that a confession was voluntary, then, to paraphrase Mr. Justice Harlan, we must be prepared to justify the view that it is no more serious in general to admit involuntary confessions than it is to exclude voluntary confessions. I am not prepared to justify that view. Compelled self-incrimination is so

alien to the American sense of justice that I see no way that such a view could ever be justified. If we are to provide 'concrete substance' for the command of the Fifth Amendment that no person shall be compelled to condemn himself, we must insist, as we do at the trial of guilt or innocence, that the prosecution prove that the defendant's confession was voluntary beyond a reasonable doubt." *Lego* v. *Twomey,* supra, 493–94 (Brennan, J., dissenting).

Indeed, even under the best of circumstances, the suspect nature of a confession requires this higher standard of proof. "Confessions are usually obtained in the psychological atmosphere of police custody and in the greatest secrecy in which the cards can be stacked against the accused. He has no means of combating the evidence produced by the police save by his own testimony. The stakes are too high and the risk of error too great to permit a determination of admissibility to be decided by a balance of probabilities." *State* v. *Phinney,* supra, 147.

Accordingly, I would find that the state constitutional right not to be compelled to give evidence against oneself requires proof beyond a reasonable doubt that the confession was voluntarily made before it can be admitted into evidence. I would, therefore, remand this case to the trial court for a determination of whether the confession was voluntary beyond a reasonable doubt. If it was not, there should be a new trial.[2] See id.

---

[2] Although the defendant had raised the state constitutional claim in his motion to suppress, he had failed to claim specifically that the state was required to prove that the confession was voluntary beyond a reasonable doubt. Is the majority now holding in its footnote 9 that, even if the defendant had raised the claim with sufficient specificity in regard to the burden of proof, and even if he had properly preserved this claim at trial, the defendant would *still* not prevail because he had failed to file a request for an articulation on whether the state had met the higher burden of proof? Instead of creating new hoops for the defendant to jump through in order to obtain review of his rights under the constitution, we should remand

## II

Failing to give so much as an admonition to the trial court, the majority implicitly continues to give its blessing to the jury instruction that "the law is made to protect society and innocent persons and not to protect guilty ones." This jury instruction was subsequently underscored in this case when the trial court again stated: "In summary, and to remind you of your obligation, it is the sworn duty of courts and jurors to safeguard the rights of persons charged with crime by respecting the presumption of innocence which the law imputes to every person so charged. But as I said, the law is made to protect society and innocent persons and not to protect guilty ones."

The Second Circuit Court of Appeals viewed similar language with disfavor when a prosecutor argued to the jury that the fifth amendment "was a 'protection for the innocent' and not 'a shield' for 'the guilty,' " and reversed a conviction from our state court in *Floyd* v. *Meachum,* 907 F.2d 347, 354 (2d Cir. 1990). The remarks by the prosecution in *Floyd* and those made by the trial judge in this case both violated the accused's constitutional due process right by diluting the state's burden of proof. "The heavy burden of proof that the United States Constitution, as interpreted by the [United States] Supreme Court, imposes on the prosecution means that the guilty will sometimes go free. . . . [C]onstitutional rights are not conditioned on guilt or innocence and [t]he requirement of proof

the case to the trial court for a determination of whether the confession would be admissible upon a showing that the confession was freely given beyond a reasonable doubt. If it would not be admissible under this higher burden of proof, then there should be a new trial. *State* v. *Phinney,* 117 N.H. 145, 370 A.2d 1153 (1977). The majority's new requirement for appellate review will preclude many constitutional claims from being reviewed. Accordingly, I strongly disagree.

beyond a reasonable doubt for a conviction is neither a sword, nor a shield, but a necessary element of proof placed solely upon the prosecution. . . . The prosecutor's statements, if taken literally, would mean that a guilty person could never be acquitted on the basis of the presumption of innocence, and as a result of these misstatements, the jurors may have thought they were free to convict [the defendant] if they somehow felt or suspected he was guilty even if they were not convinced beyond a reasonable doubt." (Citations omitted; internal quotation marks omitted.) Id.

There is, however, a significant difference between what transpired in *Floyd* and what happened in this case. The instructions in this case are more egregious because they were given by the trial judge. A prosecutor's remarks are ordinarily less prejudicial than similar ones made by the trial judge. *Mahorney* v. *Wallman,* 917 F.2d 469, 473 n.4 (10th Cir. 1990); see also *State* v. *Fernandez,* 198 Conn. 1, 12, 501 A.2d 1195 (1985).

By refusing at least to indicate our disapproval of language in the instruction that implicates the right to the presumption of innocence, we encourage the continued use of this practice. Indeed, I take judicial notice that the language I find to be offensive in these jury instructions has been in common use for at least the last two decades that I sat on the trial bench. It is time to say "no more."

Accordingly, I dissent.

