[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
DECISION RE REVISED MOTION TO SUPPRESS STATEMENTS
The above named defendant filed on June 14, 1994 a revised motion to suppress any and all statements made by the defendant to members of the Waterbury Police Department or Connecticut State Police or any other law enforcement agents of the State of Connecticut relating to the subject matter of the alleged offense of murder including but not limited to any and all statements made to Detective Peter Keegan, Sergeant Neil O'Leary or Inspector John "Pudgy" Maia on or about December 18, 1992. The defendant alleges that any statements obtained were done so in violation of his Federal and State Constitutional rights in that first, any statements were the product of an unlawful arrest by the Waterbury Police in that said officers took him into custody without a warrant or probable cause to believe he had committed an offense; and second, that any statements given were not made voluntarily.
I. — FACTS
At approximately 4:00 a.m. on December 18, 1992, Officer Walter Williams of the Waterbury Police Department was shot in the head at the intersection of Orange Street and Ward Street and later that morning died from said injuries. Upon learning that she was a possible witness, officers spoke with Jacqueline Campos, who told officers at the scene and thereafter at headquarters, that she had observed two black males walking on Orange Street at approximately 4:00 a.m. and that she then heard CT Page 8691 gunshots and saw the same two men running down Ward Street. She stated to police that she saw them run into one of three houses that she pointed out to Sgt. O'Leary. Sgt. O'Leary testified that he ordered police to seal off the area and search houses pointed out by Campos. Officers checked buildings and reported nobody considered a suspect. A call was received by police at around 6:30 a.m. that someone at 227 Walnut Street in the third floor apartment might have some information concerning the shooting. Officers O'Leary, Keegan and others went to that address and found there Lucinda Crawford, George Washington and Robert "Po" Bryant. Lucinda Crawford told Sgt. O'Leary that "Po" Bryant had information about the shooting. Sgt. O'Leary talked with Robert "Po" Bryant who told him that he had been at Karen Smith's apartment on the second floor at Ward Street when two men he knew as Anthony Crawford and a guy he knew as "Kilt" ran up the stairs to the apartment and said "Just shot a cop".
At about 7:30 a.m. on December 18, 1992, in the company of "Po" Bryant, Officers O'Leary, DelPiso, Deal, Griffin and Keegan went to 47 Ward Street, one of the three buildings that had been pointed out by Campos earlier. Officers had their guns drawn as they knocked on the door. Karen Smith answered the door and O'Leary told her why the police were there and she allowed them to enter. Directly in front of the door was a bed occupied by a black male. O'Leary told the male to get out of the bed. In response to the officer, he said his name was David Robinson (identified in court by Officer O'Leary as the defendant). Another black male was on the couch in the living room. This man gave his name as Jamal James. Police told Robinson to go into the living room. Officers no longer had guns drawn at this point. Police asked for identification and the men said they had none. The man identifying himself as Jamal James gave a date of birth of November 7, 1974 and stated that he was 20 years old.
While O'Leary was asking identity of men, Keegan summoned him into the next room where Smith had told him that the men were Anthony Crawford and David Robinson, known as "Kilt". Both men denied knowledge of the shooting. Police asked them where they had been earlier and they stated that they both had been at the apartment all night. O'Leary informed them that a police officer had been shot and seriously injured. O'Leary asked them if they were willing to go to police headquarters. Both agreed to go. Officers asked them to put on shoes. The two men were not handcuffed and at no time asked to leave. Officers CT Page 8692 proceeded to take "James" and "Robinson" to separate cars to transport them to headquarters.
Immediately after they had left the apartment and before they were transported to headquarters, Karen Smith told Detective Keegan that at about ten minutes of 4:00 that morning she was in bed sleeping when "Kilt" (the defendant) jumped in her bed, his heart pounding and said "I shot a cop". Det. Keegan stayed with Karen Smith at Ward Street until she had her children taken care of.
At about 8:00 a.m. defendant and Crawford arrived at headquarters and were taken in through the police entrance rather than the public entrance. Defendant and Crawford were placed in separate interview rooms. At about 8:20 Karen Smith arrived at headquarters. The Mayor and various officials were at headquarters. Officers Egan and Cleary interviewed Crawford. Det. Keegan and Sgt. Griffin interviewed Karen Smith and officer Rydall interviewed Bryant.
From about 8:00 until 10:00 a.m., defendant was in a room by himself in police headquarters. O'Leary asked him if he wanted a soda or coffee or to use the bathroom during that time.
Between 8:00 and 10:00 a.m. statements were being taken from Crawford and Bryant. At about 10:15 O'Leary decided to interview defendant after others had said that defendant had shot the officer. Inspector John Maia in the presence of Sgt. O'Leary read defendant his rights using as a guide a form entitled "Voluntary Statement" normally used for written statements. Maia informed defendant of his right to remain silent; that anything he said could be used against him; that he had the right to an attorney and that if he could not afford one, an attorney would be appointed for him; that an attorney could be with him while he was being questioned; that he had the right to stop answering and refuse to answer any questions. Defendant was not asked to initial this form. O'Leary asked defendant if he had been arrested before to which he responded, "Yes". He also asked if he understood the rights read and he responded, "Yes". Maia asked defendant if he would talk and defendant said "Yes, but I had nothing to do with it."
O'Leary then observed high ranking officers at his door and asked Maia to move defendant out of his office to another room so that O'Leary could talk with the officers. Maia complied. CT Page 8693 Defendant said he didn't shoot the cop, Derrick did. Maia asked who Derrick was and defendant said that Crawford would know. Maia went out and asked Crawford who said that there was no Derrick, "just me and him and Kilt did it".
Det. Keegan told O'Leary at this point that Karen Smith had given a written statement that defendant had shot Officer Williams. O'Leary told Keegan to go in and tell defendant. Keegan went into the room with defendant and Maia and asked Maia if defendant had been advised of his rights. Maia replied affirmatively. Keegan then told defendant that his girlfriend Karen Smith had told him that defendant had told her that he had shot a cop. Maia said to defendant "get it off your chest" and Keegan told him to take responsibility. Defendant put his head down and said "I did it, I shot the cop". Defendant was asked if he would give a statement and he said "Yes". Keegan went out of the room and told O'Leary that defendant "went for it". Keegan went back into the room and asked about the weapon and defendant said that it was in transit and nowhere to be found.
Defendant then said that he wanted an attorney. He was asked if he wanted a public defender or a private attorney to be called. No further questions were asked. State's Attorney John Connolly who was also at the police station was informed and called Public Defender Alan McWhirter who arrived shortly thereafter. After speaking with defendant, Mr. McWhirter stated that his client would make no statement. All questioning had stopped when defendant stated that he wanted an attorney. No audio or video recording had been taken of the interview with defendant.
II. Arrest Procedure
The defendant challenges any statements made to the police as the product of art unlawful arrest alleging that the Waterbury Police Officers took him into custody without a warrant or probable cause to believe that he had committed an offense. It is admitted by all that police had no warrant. An arrest without probable cause or a warrant is unlawful and statements obtained as a result of such an arrest must be suppressed as the "fruit of the poisonous tree". Wong Sun v. United States,371 U.S. 471, 484-486 (1963). Our Supreme Court has stated that if the police obtain physical evidence or statements as the result of the seizure of a person without probable cause, in violation of the Constitution of Connecticut, Article First, Section 7 and CT Page 8694 9, the "fruit of the poisonous tree" doctrine requires that the evidence be suppressed as the product of the unlawful seizure.State v. Greenfield, 228 Conn. 62, 67 (1993) citing State v.Oquendo, 223 Conn. 635, 659-60 (1992). In Greenfield, the court sets out the necessity for a two part analysis namely first, a determination must be made as to whether defendant was seized and secondly, if so, was there probable cause for the seizure.
The fourth amendment to the United States Constitution and Article 1, Sections 7 and 9 of the Connecticut Constitution guard against the unreasonable "seizures" of a person. It is only at the point at which the person is "seized" that the constitutional safeguards are involved. California v. Hodari,499 U.S. 621 (1991). Under the U.S. Constitution a person is "seized" when there has been a show of authority or use of physical force, and a submission of the individual to such show of authority or use of force. Hodari, supra.
Under the Connecticut Constitution a seizure takes place when "in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." State v. Oquendo, supra.
Connecticut's standard for seizure is broader than the federal standard as our court relies on a profound concern with the right of personal liberty as expressed in our state constitution. Oquendo, supra at 650-652.
Defendant maintains that he was seized under either the federal or state constitutions when he was confronted at Karen Smith's apartment on Ward Street on the morning of December 18, 1992 and transported to police headquarters.
Defendant claims a "massive show of authority, by police in stationing police around the several houses pointed to by witness Campos as a house entered by the two men. It is questionable to this court as to how defendant could have had knowledge of this as he was in bed and presumably sleeping at 47 Ward Street.
After being accompanied to the Ward Street address by "Po" Bryant who had told police of the two men being at that address who had said that they shot a cop, police drew guns as they knocked on the door of Karen Smith's apartment. Bryant had told them that he had last seen and been in the company of defendant CT Page 8695 and Crawford at that apartment.
There is uncontroverted testimony that after knocking on the door of the apartment, officers were allowed to enter by Karen Smith whose apartment it was. This action appeared voluntary on her part. Upon entering and observing that defendant had no weapon, officers returned their guns to their holsters.
Police asked defendant and Crawford if they would answer some questions. A person is not arrested or seized if he freely chooses to enter into or continue an encounter with police. Police do not violate an individual's constitutional right by approaching him, by asking him if he is willing to answer some questions, by putting questions to him if he is willing to listen or by offering into evidence in a criminal prosecution his voluntary answers to such questions. State v. Damon,214 Conn. 146, 153 (1990).
Police then asked defendant and Crawford if they would go to headquarters to answer questions and both agreed to do so. They were then told to enter separate unmarked police cars. Neither was handcuffed at any time. Thereafter they were transported to headquarters. It appears to the court that there was a seizure at this point.
Now we must turn to the second prong of the Greenfield
analysis and determine whether probable cause existed for such seizure. Before arriving at the Smith apartment, police had been directed to that area by Campos who had pointed out the house on Ward Street as one entered by the two men she saw immediately running from the area where she had heard gunshots fired. Further, the court finds the officers credible in their testimony that before arriving at Ward Street they had been told by Robert "Po" Bryant that he had been at the Smith apartment shortly before and had witnessed two men run up the stairs, enter the apartment and exclaim "We just shot a cop". Bryant then directed police to Karen Smith's apartment on Ward Street. The court finds that police at this point had probable cause for a seizure. However, as soon as the two men left the apartment on their way downstairs to the police cars, Karen Smith informed Det. Keegan that defendant Reynolds, earlier that morning had jumped into bed with her and with his heart pounding, said "I just shot a cop". Without question, this would give the officers probable cause for arrest or seizure of defendant. CT Page 8696
Further, the court finds that there was no unlawful warrantless entry into the home as in State v. Geisler,222 Conn. 672 (1992) said entry having been with permission of Karen Smith, renter of the apartment and said entry having been made with probable cause.
III. Voluntariness of Statement
Defendant asserts a claim that his statement was obtained in violation of his rights provided by the Fifth andFourteenth Amendments to The United States Constitution and Article 1, Section 8 of the Connecticut Constitution, in that the statement was not voluntarily made, was without benefit of Miranda warnings, and was unreliable. Despite the fact that our Supreme Court has refused to consider whether the standard of review of voluntariness of a confession under the State Constitution should be changed to proof beyond a reasonable doubt (State v.Stanley, 223 Conn. 674 (1992)) this court will apply the higher standard of "beyond a reasonable doubt" rather than the "fair preponderance of the evidence" standard. Even in applying the higher standard, this court concludes that defendant's statement was voluntarily made.
In order for a statement to be admitted, a valid waiver of rights must be shown by the state to be voluntary, knowing and intelligent. State v. Northrop, 213 Conn. 405, 417 (1990). Whether a waiver satisfies those requirements is a question of fact dependent on the circumstances of each particular case.North Carolina v. Butler, 441 U.S. 369 (1979). Voluntariness is a factual question to be determined in light of all the circumstances and that determination involves questions of credibility. State v. McCarthy, 197 Conn. 247, 258 (1985). The test of voluntariness is whether an examination of all of the circumstances shows that the conduct of the police was such as to overbear the defendant's will to resist and bring about a confession, not freely self-determined. State v. Gonzalez,206 Conn. 213, 221-22 (1988).
Certainly, an inquiry should be made as to whether there was police coercion or overreaching. Colorado v. Connelly,479 U.S. 157 (1986). In this case, there appears to be none. Defendant was held alone in an office for a couple of hours, during which time police officers asked him if he would like a soda or coffee or to use the bathroom facilities. While there CT Page 8697 was great activity at the police headquarters involving a number of people including the mayor, it is not known what knowledge defendant had as to the presence and identity of people at headquarters.
It appears that defendant was in an office from approximately 8:30 a.m. until 10:15 a.m. while officers were taking statements from others. At about 10:15, Maia and O'Leary decided to question defendant. Maia first read defendant hisMiranda rights and asked him if he had been arrested before and whether he understood the rights. Defendant replied in the affirmative to both questions. Since defendant was not giving a written statement, he was not asked to initial any rights. The court may properly consider the defendant's experience with police (i.e. that defendant had been arrested before) and familiarity with the Miranda warnings in determining whether there was a knowing and intelligent waiver. State v. Hernandez,204 Conn. 377 (1987). Detective Keegan upon taking the statement from Karen Smith implicating defendant informed him of her statement and urged defendant to get it off his chest or take responsibility. Encouraging a suspect to tell the truth or to confess does not render a confession involuntary. State v.Chung, 202 Conn. 39 (1987); State v. Smith, 200 Conn. 465
(1986). Relevation by the police of incriminating evidence to defendant does not constitute psychological coercion. State v.Householder, 7 Conn. App. 1 (1986).
The fact that a defendant, as here, chooses to speak after being informed of his rights is highly probative of a knowing and intelligent waiver. State v. Rasmussen, 225 Conn. 55, 78
(1993). Shortly after saying "I did it, I killed a cop", defendant requested counsel. The fact that defendant invoked his right to counsel after he had spoken with the police indicated that he was aware of his rights and had voluntarily waived them up to that point. State v. Pellegrino, 194 Conn. 279,289 (1984). Once he invoked that right, questioning ceased.
There was no credible evidence offered to indicate any coercion, deception or overreaching conduct by the police that caused defendant to waive his Miranda rights. While there was no audio tape recording or video taping of defendant's interview, there is as yet no requirement in law for such to be done.
Justice Berdon in his dissent in State v. Stanley, CT Page 8698223 Conn. 674 (1992) points to common law precedent in urging the conclusion that the state constitution requires a higher standard of proof of voluntariness of a confession. In support of his position he cites Blackstone's statement that "even in cases of felony at the common law, (confessions) are the weakest and most suspicious of all testimony; over liable to be obtained by artifice, false hopes, promises or favor, or menaces; seldom remembered accurately, or reported with due precision; and incapable of their nature of being disproved by other negative evidence" 4 W. Blackstone, Commentaries on the Laws of England
(1907) p. 357.
This court readily concedes British expertise on coerced confessions, especially involving citizens of Northern Ireland. However the court herein applies the higher standard of proof.
In doing so, this court finds beyond a reasonable doubt that the oral statement of defendant Richard Reynolds given to officers at the Waterbury Police Headquarters on December 18, 1992 was voluntarily, knowingly and willingly given without coercion and with advisement and understanding of his Constitutional rights.
Therefore, the court denies defendant's Revised Motion to Suppress Statements.
/s/ Kulawiz, J. --------------- KULAWIZ